UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————x

JACQUELINE GUARASCIO AND CHRISTINE
WILE, as Legal Representatives and Guardians
of the Person of ANTHONY GUARASCIO,

        Plaintiffs,

-against-

DRAKE ASSOCIATES INC., THE
UNDERWATER AUTHORITY, a Corporation;
EIC ASSOCIATES INC., and SOUTH JERSEY
PORT CORPORATION,

        Defendants.
—————————————————————————x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/15/08
```

06 Civ. 15185 (CM)

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART EIC'S MOTION FOR SUMMARY JUDGMENT

McMahon, J:

On or about May 16, 2005, Defendant EIC Associates Inc. ("EIC"), a general contractor, retained defendant Drake Associates, Inc., The Underwater Authority ("Drake") to perform diving work for a project as a subcontractor. On February 24, 2006 at Pier IA of the South Jersey Ports Corporation ("SJPC") in Camden, New Jersey, Plaintiff Anthony Guarascio, a Drake employee, was injured while performing commercial diving work in conjunction with this project. The complaint alleges that EIC (i) is strictly liable for engaging in ultra-hazardous diving operations, and (ii) was negligent in the operation, manning, supervision, planning,

-1-

execution and implementation of Mr. Guarascio's work in the navigable waters of the Delaware river. The amended complaint further alleges that EIC breached its contractual duty to Mr. Guarascio in failing to ensure that Drake paid wage benefits to Mr. Guarascio's union. EIC now moves for summary judgment. For the following reasons, EIC's motion is granted in part and denied in part.

## BACKGROUND

*I.    Facts*

### A.    *SJPC and EIC contract to renovate and construct Pier IA*

SJPC and EIC entered into a contract, signed on February 21, 2004, by which EIC, as the contractor, agreed to supply all labor, materials, supplies and equipment for the construction to renovate and construct Pier IA and a conveyor belt system on the Pier at the Broadway Terminal in Camden, New Jersey. (Angel Decl. Ex. 1.)[1] The contract also provides for EIC to personally supervise the work, or "have a competent representative on the work who shall have written authority to carry out the instruction of the Owner and to supply men, materials, and labor as they may be required in the furnishing and delivery to the site of the proposed work, the equipment, materials and supplies bid upon." (Id. at E-2.) Pursuant to the contract, the EIC "is solely responsible for the safety of his men, *his subcontractors, and equipment*" (Emphasis supplied) and required to "continual[ly] adhere[] to safety measures and OSHA requirements." (Id. at 01110-4.)

---

[1] On October 22, 2007, the Court dismissed SJPC for lack of subject matter jurisdiction.

The contract also provides that "The Contractor and each of his Sub-Contractors shall pay each of his employees engaged in work on the project under this Contract in full (less deductions made mandatory by law) and not less often than once each week." (Def. Ex. FF, E-8.)

### *B.     EIC retains Drake as a subcontractor*

On or about May 16, 2005, EIC retained Drake to perform diving work for the project as a subcontractor. Drake was hired to place underwater "grout mattresses" on the sloped river bottom below the pier to stabilize the riverbanks under the water. That work was later extended to encompass "pile jacketing" beneath Pier IA.

Drake advised EIC that it had "established a 17-year record of near accident-free operations." (Def. Ex. PP at p.2.) Drake also indicated that its "superior safety record" has resulted in its having "one of the lowest insurance rates in the industry" and an NCII rating of .87, which "puts [it] in the top 5-10% of all underwater operation firms in the nation. (Id.) EIC was not aware of any prior accidents involving divers employed by Drake before it hired Drake.

At the time of the accident, and at all relevant times prior to February 24, 2006, plaintiff was employed by Drake.

Before Drake first performed its work at Pier IA, it prepared a "Diving Operations Plan" specifically addressing the work it was performing. (Def. Ex. NN.) Drake also prepared an "Accident Prevention Plan" for the articulated grout mattress installation. (Def. Ex. PP.)

While the work was being done, Bill Simmerman, the EIC Project Superintendant, was on site. Simmerman had a boat on site and he used that boat on several occasions to pull men out

of the water when they fell in. However, Simmerman left the job site in the Summer of 2005, when the original work was completed, and his boat went with him.

On October 31, 2005, S.T. Hudson Engineers, Inc. ("Hudson"), the engineer and owner's representative for the project, inspected Drake's grout-mattress work and discovered defects. After the inspection, either Hudson or EIC (or both) asked Drake to return to correct the grout mattress work. Drake returned to the site in January or February of 2006. Neither Bill Simmerman, nor any other EIC employee was told to be present at Pier IA after January 20, 2006, and no one from EIC was on site on the day of the accident.

*C.  EIC's supervisory relationship to Drake during the original work and thereafter*

Although the contract obligated EIC to ensure the safety of its subcontractors, EIC did not supervise the manner in which Drake performed its work or the methods it used. Nor did EIC did not provide Drake with any of the equipment used by Drake on the day of the accident, except a ladder. Throughout the course of the original work, Drake provided and set up its own equipment, and Drake personnel were the only ones who inspected the equipment, including the diving equipment. No one other than Drake monitored the equipment while the divers were under water. All of this was true during the repair work, and specifically on the day of the accident.

-4-

## D. *The accident*

On the day of the accident, Mr. Guarascio was diving in the Delaware River at Pier IA off of Camden, New Jersey. He was sent down to do corrective work on the grout mattress. He worked at a depth of approximately thirty-six feet for about 3 hours. Then he surfaced.

When Mr. Guarascio surfaced, Mr Christopher Drake, Drake's principal, observed that Mr. Guarascio was struggling and in distress, because he was not receiving any air. Mr. Drake instructed Mr. Joiner, a Drake employee, to open the valve to Mr. Guarascio's emergency air cylinder air supply, but still no air went through Mr. Guarascio's umbilical chord.

Mr. Drake, recognizing the severity of the situation, tried to hoist Mr. Guarascio over to the vertical ladder lashed to the pier, but he was not able to lift the diver and his equipment (weighing several hundred pounds) from the water to the pier, which was fifteen feet above the water. Neither Mr. Drake nor Mr. Joiner could free the diver of his heavy weight belt or open the seal of his diving helmet.

There was no rescue boat or hoist on the work site, so Mr. Drake therefore left the area to enlist the assistance of a nearby forklift on the SJPC terminal premises. Minutes later, the forklift arrived. However, a fork from the forklift became entangled with Mr. Guarascio's umbilical cord during the attempt to lift the diver from the water. Eventually the cord was untangled and Mr. Guarascio was hoisted onto the pier. His dive helmet was removed. When assessed for signs of life, he was unconscious, not breathing, and without a pulse. Emergency services were summoned and Mr. Guarascio was transported to the nearest trauma center. He

-5-

spent time in a coma while on life support. He survived, but suffered significant brain damage. He will require extensive care for the rest of his life.

## II. *Procedural History*

On December 15, 2006, plaintiffs, as next friends of Mr. Guarascio, filed their complaint. As against EIC, they alleged(i) strict liability for engaging in ultra-hazardous diving operations, and (ii) negligence in the operation, manning, supervision, planning, execution and implementation of Mr. Guarascio's work in the navigable waters of the Delaware river. On September 24, 2007, plaintiffs filed their amended complaint, which added a claim that EIC breached a duty to Mr. Guarascio imposed under the SPIC contract by failing to ensure that Drake paid wage benefits to Mr. Guarascio's union.

EIC now moves for summary judgment on these claims.

## DISCUSSION

### *1. Standard of review*

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-33. On a motion for summary judgment, the court views the record in the light most

favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

2. *Analysis*

Plaintiffs concede that they cannot maintain a claim for strict liability against EIC. Thus, the Court need only address plaintiffs' negligence and breach of contract claims.

A. **Negligence**

To establish a negligence claim under federal maritime law, a plaintiff must establish (1) the existence of a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) proximate causation of the plaintiffs' injuries, and (4) damages. Smith v. Mitlof, 198 F. Supp. 2d 492, 501 (S.D.N.Y. 2002); Petitt v. Celebrity Cruises, Inc., 153 F. Supp. 2d 240, 252 (S.D.N.Y. 2001). The same rule applies under New Jersey law. See Gilleski v. Community Medical Center, 336 N.J. Super. 646, 652, 765 A.2d 1103, 1106 (App. Div. 2001).[2]

It appears that plaintiffs assert two theories of liability: (1) EIC is vicariously liable for failing to assure the safety of Drake's employees on the work site, and (2) EIC is directly liable for failing to supervise the job site; failing to supervise the subcontractor's work; violating OSHA regulations at the work site; and hiring Drake. Plaintiffs cannot maintain either of these claims without establishing that EIC owed a duty to its subcontractor's employees.

---

[2] The parties agree that New Jersey law applies to this dispute.

-7-

Because the Court finds that EIC can be held directly liable for plaintiff's injuries, it need not address plaintiff's theory of vicarious liability. Plaintiffs' negligent hiring claim, however, is dismissed with prejudice

**i.     EIC can be directly liable to plaintiff because it assumed, and potentially breached, a duty to Mr. Guarascio, pursuant to its contract with SJPC, which may have contributed to plaintiff's injuries**

A general contractor must act in accordance with traditional tort law. O'Keefe v. Sprout-Bauer, Inc., 970 F.2d 1244, 1253 (3d Cir. 1992). In this case, plaintiffs charge that EIC committed its own negligent acts by failing to meet its obligation to ensure the safety of "his contractors and equipment." This obligation arose pursuant to EIC's contract with SJPC. Plaintiffs allege that the contractual obligation gave rise to a duty to Guarascio, which duty EIC negligently breached by failing to supervise properly the work site during the remedial work on the grout mat.

The Court is guided by the Third Circuit's decision in O'Keefe v. Sprout-Bauer, Inc., 970 F.2d 1244, 1253 (3d Cir. 1992), a remarkably similar case that interprets New Jersey law, which governs here. In O'Keefe, Sprout-Bauer entered into a contract with Bay State Milling Company to serve as the general contractor for the construction of a flour milling plant in New Jersey. The contract expressly contemplated that Sprout-Bauer would hire subcontractors to

perform different aspects of the construction. To this end, Sprout-Bauer agreed that it would "supervise and direct the Work, using [its] best skill and attention and shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." Id. At 1257. Sprout-Bauer also agreed, in a section entitled "SAFETY" that "it shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection wit the work. [Sprout-Bauer] shall take all necessary precautions for the safety of, and shall provide the necessary protection to prevent damage, injury or loss to: A all employees on the Work and other persons and organizations who may be affected thereby." Id. Finally, Sprout-Bauer was also required to "designate a responsible representative at the site whose duty shall be the prevention of accidents." Id.

The Third Circuit concluded that these contract provisions "indicate that Sprout-Bauer agreed to assume a duty to protect the subcontractors' employees and to supervise all programs." Id. The court found that Sprout-Bauer may have breached this duty by failing to have an onsite representative who could properly supervise the rigging and installation of the plansifter that caused plaintff's injuries.

Tthe contract provisions in this case are remarkably similar to those in O'Keefe, and indicate that EIC agreed to assume a duty to protect the subcontractors' employees, adhere to OSHA, and supervise the project. See O'Keefe, 970 F.2d at 1257. In its contract with the SJPC, EIC was "solely responsible for the safety of his men, his subcontractors, and equipment" and

was required to "continual[ly] adhere[] to safety measures and OSHA requirements." (Id. at 01110-4.) The contract also provides for EIC to personally supervise the work, or "have a competent representative on the work who shall have written authority to carry out the instruction of the Owner and to supply men, materials, and labor as they may be required in the furnishing and delivery to the site of the proposed work, the equipment, materials and supplies bid upon." (Id. at E-2.)3

The record demonstrates that EIC may well have breached this duty by failing to supervise the project, maintain a safe work site, and comply with OSHA. It is undisputed that EIC did not supervise plaintiffs' work. EIC argues that it was not required to supervise Drake's work, because the cost of supervision was included in Drake's contract. (*See* Schmidt Depo 99:8-11, "[EIC] provided [Drake] a price that included supervision.") However, the contract provided that EIC "personally supervise the work, or "have a competent representative on the work site who shall have written authority to carry out the instruction of the Owner." In addition, Michael Fasnacht, the owner's representative for this project, testified that it was his understanding that EIC was responsible for the safety of the job site, and was supposed to "always" have some supervision on site. (Fasnacht Depo. 47:9-15.) A reasonable juror could find that breached its duty to Mr. Guarascio by pulling all supervision off the job site, as well as

---

3EIC's argument that it owed no duty to plaintiff, because plaintiff was not an intended third-party beneficiary to the EIC-SJPC contract, is a red herring. Plaintiff is not suing EIC for breach of the EIC-SJPC contract. Instead, plaintiffs argue, and this Court agrees, that EIC assumed a duty to EIC under tort law, which it may have breached.

-10-

a rescue boat, which might have prevented the severity of plaintiff's injuries, EIC breached its duty to plaintiff. See O'Keefe v. Sprout-Bauer, Inc., 970 F.2d 1244, 1257-58 (3d Cir. 1992).

Additionally, a reasonable juror could find that EIC breached its duty to ensure the safety of Drake's employees by failing to "continual[ly] adhere[] to safety measures and OSHA requirements." (Id. at 01110-4.) EIC argues that it could not have breached this duty because, even if EIC was a "controlling employer" (which it vigorously disputes), its duty with respect to safety for highly specialized work such as commercial diving was limited only to conspicuous hazards. Assuming arguendo that this is true, however, a reasonable juror could find that the absence of a rescue boat was a conspicuous hazard.

EIC argues that the only party that can vindicate rights created by the EIC/SJPC contract is the contra-party to that contract, SJPC. EIC is absolutely correct that plaintiffs have no standing to sue EIC for breaching the provision of the SJPC contract that required it to protect the employees of its subcontractors. But EIC is not suing on a theory of breach of contract – it is suing on a theory of negligent performance of a duty of care to Guarascio that happens to have been imposed as a result of a contractual undertaking between EIC and a third party (SJPC). Under O'Keefe, plaintiffs have standing to bring such a claim, whether or not they have standing to sue for breach of the contract itself.

Therefore, EIC's motion to dismiss the negligence claim is denied.

-11-

### ii. Plaintiffs' negligent hiring claim is dismissed with prejudice

To state a negligent hiring claim under maritime law, the plaintiff must establish that "the employer either failed to exercise reasonable care in the selection of the contractor or had actual or constructive knowledge of the contractor's insufficiency." Jurgens v. Polling Transportation Corp., 113 F. Supp. 2d 388, 400 (E.D.N.Y. 2000) (internal quotations omitted). New Jersey follows the same rule. See Mavrikidis v. Patullo, 153 N.J. 117, 707 A.D.2d 977 (1998). Here, plaintiffs have not raised a genuine issue of material fact with respect to either test.

Mr. Schmidt, EIC's Vice President, testified that he invited Drake to bid on the subcontract because "Drake Associates is known throughout the harbor and had sent [him] brochures from time to time." (EIC Ex. BB 126:3-5.) He stated that Drake's had the reputation of being "a good, competent diving contractor." (Id. 126:15-19.) Indeed, Drake had a 17-year record of near accident-free operations, one of the lowest insurance rates in the industry, and an NCCI rating that put Drake in the top 5-10% of all underwater operations in the country. (Def. Ex. PP, p.2.)

Plaintiffs, however, argue that EIC did not undertake any due diligence with regard to the hiring of Drake, except for reading a brochure that Christopher Drake sent to it. (See Schmidt Depo 129:11-18.) Yet, even if it had conducted the due diligence that plaintiffs asserts it should have, EIC would have learned of two things— one lawsuit related to a diving accident, and one lawsuit related to a job that Drake failed to complete. The latter suit is, of course, irrelevant to the issue of Drake's history of operating as a safe diving contractor. One safety-related lawsuit

in 17 years is insufficient to raise a triable issue of fact that Drake was incompetent and/or that EIC failed to exercise reasonable care in its selection of Drake. This is claim is dismissed with prejudice.

## B. *Breach of contract*

EIC and Drake have admitted that Drake did not pay Mr. Guarascio's employment benefits. Plaintiffs argue that EIC is contractually liable to plaintiff for Drake's failure to make these payments. EIC, on the other hand, argues that plaintiffs cannot maintain their breach of contract claim because (1) there was no employer-employee relationship between Mr. Guarascio and EIC, so Drake, not EIC, had the duty to make any wage payments, and (2) Mr. Guarascio was not the intended third party beneficiary of the contract between EIC and SJPC.

"The duty to pay wages is an obligation that can only arise from the employer-employee relationship." Jernigan v. Lay Barge Delta Five, 296 F. Supp. 127, 129 (S.D. Tex. 1969), *aff'd*, 423 F.2d 1327 (5th Cir. 1970). It is undisputed that Mr. Guarascio was employed by Drake, not EIC. Plaintiffs have not cited any cases which hold that a general contractor can be held liable for a subcontractor's failure to make benefits payments on behalf of its employees.

However, plaintiffs argue that EIC can nonetheless be held liable because Mr. Guarascio was an intended third-party beneficiary of the contract between EIC and SJPC. See Fackelman v. Lac d'Amiante du Quebec, 398 N.J. Super. 474, 487-88 (App. Div. 2008). The EIC-SJPC contract provides that "The Contractor and each of his Sub-Contractors shall pay each of his employees engaged in work on the project under this Contract in full (less deductions made

-13-

mandatory by law) and not less often than once each week." (Def. Ex. FF, E-8.) This provision, however, does not evidence an intention to make Drake employees third-party beneficiaries to the contract. The plain language states that "each" sub-contractor shall pay "each" of his employees. Thus, everyone was responsible for paying its own workers. EIC was not obligated to pay the wages of its subcontractors' employees.

Plaintiffs attempt to get around this problem by arguing that EIC is the only signatory to the contract besides SJPC. However, Drake was obviously not a signatory to the agreement, because it was not retained until 15 months after this contract was signed. The fact that it was not a signatory does not relieve Drake of its sole responsibility to make benefits on behalf of its employees, or create a duty for EIC to do so.

Nor does the fact that on October 7, 2005, EIC representative Carlos Fazenda wrote a letter to Christopher Drake requesting that EIC be authorized "via a two-party check" (both it and Drake) to pay the outstanding dock builder benefits for certain Drake employees. (Angel Decl. Ex. 15.) To the contrary, it seems that EIC needed Drake's permission to take corrective action and make these payments on its own, when Drake was failing to do so. To hold EIC liable under this theory would be, in effect, to punish it for attempting to take corrective action to solve a problem that it had no duty to solve.

The "breach of contract" claim for unapid benefits is dismissed with prejudice.

## CONCLUSION

The trial of this action will take place on Monday, January 12, 2009 at 9:30 a.m. The Final Pre-Trial Conference will be held Friday, December 19, 2008 at 2:00 p.m. At the final pre-trial conference, the court will finalize the witness list, rule on all objections to exhibits and admit all documentary evidence that will be used at trial. Trial counsel must be present, prepared to argue every objection to any document and to identify every witness it actually intends to call. Rulings made at the conference will set the parameters for the trial.

In limine motions, if any, are due on October 31, 2008. Responsive papers are due ten days later, on November 14, 2008. The court DOES NOT ACCEPT REPLY PAPERS on in limine motions. The court will rule on all in limine motions at the final pre-trial conference.

The remaining parties are directed to revise the Pre-Trial Order to eliminate witnesses, exhibits and contentions that are no longer at issue by virtue of the dismissal of the case as against Global Marine, and to submit a revised Pre-Trial Order if that proves necessary, no later than September 29, 2008.

This constitutes the decision and order of the court.

Dated: September 15, 2008

U.S.D.J.